**TEXAS WORKERS' COMPENSATION INSURANCE FUND, Appellant,**

v.

**Lucas LOPEZ, Appellee.**

No. 04-98-00338-CV.

Court of Appeals of Texas, San Antonio.

Jan. 12, 2000.

Rehearing Overruled Feb. 2, 2000.

David L Brenner, Kristin L. Gustavson, Burns, Anderson, Jury & Brenner, L.L.P., Austin, Lynne Liberato, Michelle M. Monger, Haynes and Boone, L.L.P., Houston, Jeff R. Boggess, Texas Workers' Compensation Ins. Fund, Senior Staff Atty., Austin, for appellant.

Michael P. Doyle, James T. Liston, Cook, Butler & Doyle, L.L.P., Houston, for appellee.

1. The Fund is Moran's workers' compensa-

Sitting: PHIL HARDBERGER, Chief Justice, ALMA L. LÓPEZ, Justice, KAREN ANGELINI, Justice.

## OPINION

Opinion by: PHIL HARDBERGER, Chief Justice.

The Texas Workers' Compensation Insurance Fund ("the Fund") appeals the trial court's entry of judgment in favor of Lucas Lopez ("Lopez") following a jury trial. In three issues, the Fund alleges: 1) the trial court erred in taxing the court costs against the Fund (because under the Fund's reading of the judgment, the Fund was the successful party at trial); or alternatively, 2) Lopez's causation evidence was scientifically unreliable and should not have been admitted, and 3) Lopez's causation evidence was legally insufficient to sustain the jury's verdict. We affirm.

### BACKGROUND

Lopez worked as a sandblaster for T.B. Moran Company ("Moran")[1] from 1974 to October 1996. During the early 1990's, he worked as a pipe fitter for another firm, but returned to work for Moran from at least 1994–96. In 1995, Lopez passed his biennial physical exam, as required by Moran, with no sign of lung problems. During a sandblasting operation on an oil derrick in October 1996, Lopez began to experience coughing and fatigue. The following week, he visited a physician. A week later, he returned to work for only one day. Afterward, he never returned.

Dr. Jose Ugarte diagnosed Lopez as having chronic bronchitis and chronic obstructive pulmonary disease ("COPD"). Dr. Ugarte regarded Lopez's prognosis as "poor." Lopez filed a claim for workers' compensation benefits, claiming that he sustained lung damage "while in the course and scope of his employment" as a sandblaster.

tion insurance carrier.

Following a contested case hearing, the hearing officer concluded that Lopez did not sustain a compensable injury and that Lopez did not suffer from a disability. In an unpublished decision, the Texas Workers' Compensation Appeals Panel affirmed the case hearing officer's decision. Lopez filed suit for judicial review of the appeals panel's decision in the 79th Judicial District Court.

Before the jury trial began, the parties stipulated that "[d]ue to his chronic obstructive pulmonary disease, Lucas Lopez was unable to obtain and retain employment at his pre-injury wage beginning on October 21, 1996 and continuing through the date of trial." Causation of Lopez's injury was the only issue submitted to the jury: Whether Lopez sustained an occupational disease "in the form of [COPD] in the course and scope of his employment with [Moran.]" The jury returned a 10–2 verdict that answered, "Yes." Following unsuccessful motions for judgment n.o.v. and a new trial, the Fund appeals.

DISCUSSION

*1. Construing the Judgment*

■ In its first issue, the Fund argues that because the judgment awards *only* the costs of the lawsuit to Lopez, the judgment does not in turn hold the Fund liable to Lopez for payment of benefits. The result, according to the Fund, is that the judgment should be construed in a manner such that the Fund is the successful party. Because the Fund regards itself as the successful party, it asserts that the trial court erred in taxing costs against it.

In part, the judgment contains a finding that Lopez sustained COPD while employed with Moran. The end of the judgment reads "It is Further Ordered and Decreed that costs of court of Plaintiff, Lucas Lopez, shall be assessed against Defendant, Texas Workers' Compensation

**2.** The judgment does not contain any other paragraph prefaced by "It is Ordered and

Fund.... The Court denies all relief not granted in this Judgment."[2] Because neither party disagrees that the unsuccessful party should bear the costs, the issue for us is how to construe the judgment. Two Texas Supreme Court cases are relevant in analyzing the Fund's assertions: *Constance v. Constance* and *Wilde v. Murchie.*

*a. Constance v. Constance*

■ In *Constance v. Constance*, the Texas Supreme Court addressed the issue of whether a divorce decree adjudicated the ownership of retirement benefits to be received by the husband. *See Constance v. Constance*, 544 S.W.2d 659, 659 (1976). The decree read, in part:

And it further appearing to the Court that the Defendant ... will receive approximately $220.00 per month as retired pay at this time.... And inasmuch as no award is being made to Plaintiff for any portion of the retired pay, the Court finds that the sum of $200.00 per month for child support is reasonable and it is accordingly ORDERED by the Court that the Defendant contribute the sum of $200.00 per month toward the support and maintenance of said minor children....

*Id.* at 660. The court construed the judgment with the goal of harmonizing and giving effect to *all* the trial court had written. *See id.* All of a judgment's provisions should be given a fair reading in order to determine what the court has adjudicated. *See id; see also Point Lookout West, Inc. v. Whorton*, 742 S.W.2d 277, 278 (Tex.1987) (per curiam) (considering statements made by the trial court following the close of evidence in ascertaining the court's intent underlying the judgment); *Rodgers v. Williamson*, 489 S.W.2d 558, 560 (Tex.1973) (reversing the judgment of the appellate court that construed an Illinois judgment in a contrary manner to the express provisions of the judgment).

Decreed."

The *Constance* court stated that the child support award (payable by the husband) rested upon the trial court's decision to award him the retirement benefits. *See Constance*, 544 S.W.2d at 660. Concluding that the retirement benefits had been decreed by the trial court is reasonable; otherwise, the benefits would have been included in the *property settlement* instead of the *decree*. *See id.*

### b. Wilde v. Murchie

■ In *Wilde v. Murchie*, the supreme court considered whether a divorce decree partitioned a community homestead. *See Wilde v. Murchie*, 949 S.W.2d 331, 332 (Tex.1997) (per curiam). The court stated that an ambiguous decree (judgment) must be interpreted by "reviewing both the decree as a whole *and the record*" in order to carry out the property disposition correctly. *Id.* at 332 (emphasis added) (citations omitted). *As with other judgments,* courts should construe divorce decrees "as a whole toward the end of harmonizing and giving effect to all that is written." *Id.* at 333 (citation omitted). Courts should give a fair reading to all of the provisions of the judgment instead of relying solely on the decretal words. *See id.*

Although the divorce decree in *Wilde* did not expressly divest the wife of her interest in the community homestead, the decree liquidated her equity interest in the home and stipulated that the husband assumed the debts on the property; the supreme court concluded that the decree revealed the divorce court's decision that the husband take *sole possession* of the community home. *See id.* The record supported this conclusion; in the petition for divorce, the wife indicated that the husband could take possession of the house. *See id.* The actions of the parties after the divorce (his sole possession for twenty years, the collection of a monetary award instead of proceeds from a partition) support the construction intended by the trial court: The decree did not order a partition. *See id.*

### c. Application

The language of the judgment in the present case reads, in part:

> The Court, in accordance with the stipulations of the parties and the jury's verdict, therefore makes the following findings of fact and law:
>
> 1) Due to his [COPD, Lopez] was unable to obtain and retain employment at his pre-injury wage . . .; and
>
> 2) [Lopez] sustained an occupation disease in the form of [COPD] in the course and scope of his employment with [Moran].
>
> A copy of the judgment having been served by certified mail . . . pursuant to Texas Labor Code 410.258 the Court may enter judgment as set forth that [the Fund] is liable for benefits as provided by law to [Lopez], including payment of incurred but unpaid benefits. . . .
>
> **IT IS FURTHER ORDERED and DE-CREED** that costs of court of [Lopez] shall be assessed against [the Fund]. . . . The Court denies all relief not granted in this Judgment.

The Fund claims that the "decretal language" applies only to taxing the costs against the Fund. According to the Fund, because only the costs are "decreed," the trial court did not render judgment on the liability of benefits in Lopez's favor, making the Fund the successful party. Because the Fund regards itself as the successful party, it does not believe that it is liable for costs.

### d. Harmonize, Look to the Record, and Examine the Parties' Actions

We do not believe that the judgment is ambiguous. If the judgment is ambiguous (as the Fund contends), the case law provides guidance for its proper construction. The case law stands for 1) giving effect to that which the court has written in the judgment, 2) considering the trial court's intent, 3) reviewing the record, and 4)

looking to the parties' actions. In construing the judgment, we note that the jury verdict gave an affirmative answer to the question of whether Lopez sustained COPD in the course of his employment. We also note that the Fund filed a motion for judgment n.o.v. after the trial court received the verdict of the jury, asking that the court render judgment in favor of the Fund. The latter action implies that judgment would otherwise be entered in favor of Lopez. The trial court denied the motion. The Fund filed a motion for new trial after the trial court entered its judgment. The Fund asked the trial court to "set aside the jury verdict and grant a new trial." This action suggests that the Fund knew it was unsuccessful at trial.

In giving effect to the trial court's language in the judgment, being mindful of the record, and cognizant of the parties' actions,[3] we find that the trial court intended for:

1. The Appeals Panel's decision to be set aside as provided by law;
2. The Fund to pay compensation and medical benefits;[4]
3. The Fund to pay costs; and
4. All other relief to be denied.

### e. Conclusion

The judgment in the present case is in favor of Lopez. We overrule the Fund's first issue.

### 2. Admission of Lopez's Scientific Evidence

In its second issue, the Fund asserts that Lopez's causation evidence is not scientifically reliable and should not have been admitted. Lopez introduced testimony by his witness, Dr. Muhammad Mujahid Salim, as to the cause of Lopez's COPD, via deposition. The Fund objected.

### a. Standard of Review

We determine whether the trial court properly admitted Dr. Salim's testimony by examining the trial court's actions under an abuse of discretion standard of review. *See E.I. du Pont de Nemours and Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *Wal–Mart Stores, Inc. v. Garcia*, 974 S.W.2d 83, 86 (Tex.App.-San Antonio 1998, no pet.). The decision to admit evidence is in the discretion of the trial court. *See Robinson*, 923 S.W.2d at 558 (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985)); *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (Tex.1985). This court has stated that an abuse of discretion exists when the court fails to analyze or apply the law correctly. *Muecke v. Hallstead*, No. 04–97–00483–CV, 2000 WL 328129, at *2, —— S.W.3d ——, —— (Tex.App.-San Antonio March 29, 2000, no pet. h.). Because the gatekeeper function is a matter "committed to the trial court's discretion," "the reviewing court may not substitute its judgment for that of the trial court." *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex.1992).

### b. Admissibility of Scientific Evidence

(1) IN GENERAL

▉▉▉ Texas Rule of Evidence 702 permits a witness who is "qualified as an

---

**3.** We are also cognizant of this court's orders prior to the case being submitted. Our orders dated November 3, 1998, February 17, 1999, and April 20, 1999 indicate that the trial court judgment was favorable to Lopez. The November 3, 1998 order of this court, in disposing of the motion to enforce the judgment, states, in part:

On March 3, 1998, after a jury trial, the trial court found Lopez had sustained an occupation disease in the course and scope of his employment and he had been unable to obtain and retain employment at his pre-injury wage, and it *entered a judgment finding that TWCIF is liable to Lopez for benefits as provided by law.*
(emphasis added).

**4.** The Appeals Panel determines the amount due to Lopez in the form of compensation and medical benefits. *See* TEX. LAB.CODE ANN. §§ 410.207, .302 (Vernon 1996).

expert by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise" if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." TEX.R. EVID. 702. Such testimony must not be substantially outweighed by danger of unfair prejudice, confusion of the issues, or other factors. TEX.R. EVID. 403. In order to be admissible under Rule 702, scientific evidence must be relevant and reliable. *See Garcia,* 974 S.W.2d at 85 (citing *Robinson,* 923 S.W.2d at 556). The following factors may be used to determine the admissibility of evidence under Rule 702:

(1) the extent to which the theory has been or can be tested;

(2) the extent to which the technique relies upon the subjective interpretation of the expert;

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of the theory or technique.

*Robinson,* 923 S.W.2d at 557; *see Merrell Dow Pharm. v. Havner,* 953 S.W.2d 706, 714 (Tex.1997), *cert. denied,* 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998); *see also Garcia,* 974 S.W.2d at 85. The purpose of these factors is to determine the *reliability* of the scientific expert's analysis. *See Havner,* 953 S.W.2d at 714.

The issue at trial was the *cause* of Lopez's COPD. The jury was asked whether Lopez sustained an occupational disease "in the course and scope of his employment with the T.B. Moran Company." Dr. Salim, a board-certified pulmonologist, testified that he believed Lopez's COPD was

related to his occupation as a sandblaster. Dr. Salim's testimony sustains the requirement that Lopez show general causation: that the silica, dust particles, and other particulate matter are capable of causing the symptoms that manifest themselves as COPD. The Fund did not challenge Dr. Salim's qualifications or credentials. Dr. Salim relied upon his observation of Lopez, his knowledge of COPD and its causes, as well as Lopez's medical history in reaching his conclusion regarding the cause of Lopez's COPD.

(2) HAS THE THEORY BEEN, OR CAN IT BE, TESTED?

■ Dr. Salim testified that occupational exposure to silica and other mineral dusts caused Lopez's COPD. The first article attached to Lopez's brief reveals that this theory can be tested. In the synopsis of the article, the authors explain that "[t]he object of this study was to assess the relationship between occupational dust exposure and [COPD]." Andrew D. Oxman et al., *Occupational Dust Exposure and Chronic Obstructive Pulmonary Disease,* 148 AM. REV. RESPIRATORY DISEASES 38, 38 (1993). The authors concluded, based upon a review of several studies from various countries, that although "it is likely that the results *underestimate the effect of occupational dust exposure on* lung function, *COPD,* and chronic bronchitis," there existed "good evidence that exposure to occupational dust can cause . . . losses of lung function in both smokers and non-smokers, and that it can be a cause of marked COPD in smokers." *Id.* (emphasis added).

The summary of the next article states, in part, that a random sampling of 8,515 adults (an epidemiological study) "was used to examine the relationships between occupational exposures to *dust* or to gases and fumes and chronic respiratory symptoms. . . ." R.J. Korn et al., *Occupational Exposures and Chronic Respiratory Symptoms–A Population Based Study,* AM. REV. RESPIRATORY DISEASES 298, 298

(1987) (emphasis added). The authors conclude that:

> In summary, we have shown that occupational exposures to dust and to gases or fumes independently increase the prevalence of chronic respiratory symptoms in a general population after taking into account age, gender, city of residence, and current and past cigarette smoking habits. *These occupational exposures also may be associated with an increased prevalence of COPD....*

*Id.* at 303 (emphasis added). We believe that these articles show that Dr. Salim's theory (occupational exposure to dust can cause COPD) has been, and is subject to, reliable testing.

**(3) DOES THE THEORY RELY UPON THE SUBJECTIVE INTERPRETATION OF THE EXPERT?**

■ Dr. Salim's testimony supports the issue of specific causation ("Did occupational dust exposure cause *Lopez*'s COPD?") as well. This testimony is based on objective criteria (drawn from, for example, the pulmonary function test and testimony regarding Lopez's working environment). The theory advanced by Dr. Salim does not rely upon his subjective interpretation. Even if the articles in question discuss gold miners as opposed to sandblasters, there is a sufficient basis that the articles offer for the proposition that small particles (dust, sand, etc.) in a worker's lungs have harmful effects. The evidence also shows that the protective garments Lopez wore from 1974–90 (a hood tied off with a rope and a 3M-type painter's mask) were insufficient protection to guard against the exposure in question.

**(4) HAS THE THEORY BEEN SUBJECTED TO PEER REVIEW OR PUBLICATION? HAS THE THEORY BEEN ACCEPTED AS VALID BY THE RELEVANT SCIENTIFIC COMMUNITY?**

■ The studies that are contained in the articles were published. The view advocated by Dr. Salim is not novel. One of the articles reviews several studies. We conclude that Dr. Salim's theory and the underlying studies have been "in circulation" among the scientific community for some time. Unlike the epidemiological study criticized in *Havner*, the studies referenced by Lopez have been published. *See Havner*, 953 S.W.2d at 726 (criticizing the study because "it has *never* been published or otherwise subjected to peer review") (emphasis added).

**(5) WHAT IS THE THEORY'S POTENTIAL RATE OF ERROR?**

■ The confidence level of the studies cited by Lopez is 95%, within the acceptable range required under *Havner*. *See Havner*, 953 S.W.2d at 723.

Although the Fund asserts that Dr. Salim failed to cite specific studies showing that Lopez's risk for COPD was at least that of the general population for developing COPD, our reading of *Havner* does not reveal a clear indication that a doubling of the risk is necessary for statistical significance. *Cf. id.* at 725. The Korn study in the present case reveals that the adjusted odds ratio for COPD in subjects with current dust exposure was 1.87; this number reflected a 95% confidence level with a confidence interval that, in part, exceeded 2.0: 1.14–3.07.

The present case is distinguishable from *Havner*. In *Havner*, approximately thirty studies had all concluded that Bendectin did not cause birth defects. *See Havner*, 953 S.W.2d at 708. Against this backdrop, the supreme court criticized the Havner's scientific evidence and set a high standard for the use of epidemiological studies in the face of *contrary* scientific belief. *See generally id.* In the present case, the scientific evidence is overwhelmingly in favor of Lopez's proposition. His long-term occupational exposure to dust, silica, and other particulate matter caused him to develop symptoms consistent with COPD.

**(6) WHAT NON-JUDICIAL USES HAVE BEEN MADE OF THE THEORY?**

■ The theory advanced by Dr. Salim has also been used to develop better pro-

tective clothing for the workers involved in operations in which exposure to dust and small particulate matter is high. This better understanding is reflected by the improvement in Moran's requirements for their workers; after 1990, workers such as Lopez were required to wear a protective suit over their clothing that provided a pressurized and sealed supply of purified air. The theory has been used to intensify federal regulations of employers who are involved in sandblasting operations as well as other high-dust activities.

### (7) SPECIFIC CAUSATION

Lopez's evidence, when coupled with Dr. Salim's testimony, is also sufficient to show specific causation, that Lopez's occupational exposure to dust caused him to develop COPD. Carlos Aguilar (one of Lopez's co-workers for seventeen years), George Moran (Lopez's supervisor for fifteen years), Otilio Trevino (one of Lopez's co-workers), Sophia Lopez (Lopez's wife), and Lopez himself, all provided sufficient testimony as to Lopez's working conditions (which included dust so thick that workers could not see in front of themselves), his "protective" gear (which for several years amounted only to a hood tied off with a rope and a "3M" filter mask worn inside), and the side effects that he suffered during his employment (breathing and coughing out dust after he left the job site). Even the Fund's witness, Mike Merta, explained that the new protective gear, which provides a pressurized environment for workers, was not available to Moran workers before 1990. Ample evidence existed to draw the conclusion, in light of Dr. Salim's testimony, that Lopez met his burden as to specific causation.

### (8) SUMMARY

Lopez sustained his burden as to both general and specific causation in showing that Lopez's occupational exposure to dust, silica, and other particulate matter caused the symptoms that comprise COPD. Lo-

pez's expert scientific witness, Dr. Salim, also met the reliability test.

Dr. Wooley, a board-certified pulmonologist who testified on behalf of the Fund, agreed that "different physicians, even in the same speciality, can look at the same case and have different opinions." Dr. Wooley testified that his opinion regarding the causation of Lopez's COPD differs from other board-certified pulmonologists such as Dr. Lee of the University of Texas Medical Branch in Austin and Dr. Salim. Dr. Wooley's opinion also differs from Dr. Ugarte and Dr. Roe, who treated Lopez at the Spohn Clinic. Dr. Wooley also testified that he disagreed with the conclusion of Dr. Marrs, the radiologist at Corpus Christi Hospital who interpreted Lopez's x-rays. Although Dr. Wooley formed his opinion (that Lopez does *not* have COPD) in part by examining Lopez's x-rays, Dr. Wooley agreed that "*a normal x-ray will not rule out a diagnosis of chronic obstructive pulmonary disease.*" Dr. Wooley acknowledged that the journal that published the 1987 study (which concluded that COPD can be independently associated with occupational exposure) would have required any article to go through the peer review process before publication. The Fund's evidence adds credence to the reliability of the theory advanced by Dr. Salim.

The trial court did not abuse its discretion in allowing the admission of Dr. Salim's testimony. We overrule the Fund's second issue.

### 3. Legal Sufficiency of Lopez's Causation Evidence

■■■ Because Dr. Salim's testimony was properly admitted, the question becomes whether this evidence would support a jury verdict. See *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex. 1994); *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 600 (Tex.1993).

The connection between Dr. Salim's testimony and Lopez's condition is not difficult to make. The theory is that oc-

cupational exposure to silica and dust predisposes a worker to develop COPD. Lopez was exposed to such dust for approximately 20 years, with minimal protection during the majority of his employment. Lopez suffers from COPD. Lopez, his co-workers, and supervisor testified that working conditions were very dusty, causing an inability to see or breathe freely while inside the tanks. Lopez introduced reports regarding his medical condition and prognosis. A jury could reasonably conclude that Lopez's exposure as a sandblaster to silica dust and other dusts caused his COPD. We overrule the Fund's third issue.

### CONCLUSION

We affirm the trial court's entry of judgment.