834 So.2d 1126 (2002)
Dorothy J. JONES, Plaintiff-Appellant,
v.
RUSKIN MANUFACTURING, A Division of Tomkins Industries, Inc., Defendant-Appellee.
No. 36,548-WCA.
Court of Appeal of Louisiana, Second Circuit.
December 11, 2002.
*1127 Frank M. Ferrell, Shreveport, for Appellant.
Dorothy J. Jones, In Proper Person.
Cook, Yancey, King & Galloway, by Scott L. Zimmer, Shreveport, for Appellee.
Before CARAWAY, PEATROSS and KOSTELKA, JJ.
CARAWAY, J.
The plaintiff in this worker's compensation case alleges that she contracted an occupational disease from fumes from paint, diesel, and other substances while in the employ of the defendant. The worker's compensation judge ("WCJ") found that the plaintiff did not have an occupational disease and denied benefits. For the following reasons, we affirm.

Facts
The plaintiff, Dorothy Jones, worked for the defendant, Ruskin Manufacturing, from August 27, 1984 to February 2, 1999. Ruskin is a business engaged in the manufacturing of metal louvers.
Jones has complained that she contracted an occupational disease, neurotoxicity, as a result of alleged exposure to toxic fumes at Ruskin's factory. Whenever Jones is exposed to perfumes, colognes, or any type of fumes, she allegedly has "seizure-like" spells. Fumes were emitted into the air as a result of welding and painting activities that occurred at the facility. Other fumes were also released into the factory. On February 1, 1999 and February 2, 1999, Jones alleged that the constant inhaling of the fumes caused her to have the "seizure-like" episodes or spells and rendered her unable to work.
Adele Baker, Calvin Boston, Darren Lee and David Williams, all of whom were Jones' co-employees, testified that employees were exposed to welding fumes, paint fumes, vehicle exhaust fumes, and fumes from chemicals used in the plant. All four co-employees knew of Jones' alleged allergies to perfumes and colognes. They further testified, however, that vents and fans removed most of the air contaminants and that none of them had personally suffered any of the symptoms complained of by Jones.
Larry Smith, a plant manager at Ruskin, testified that he had knowledge of Jones' alleged condition and that Jones had provided him with records from Minden Medical Center, which stated that Jones should not be exposed to paint fumes. He further testified, however, that no place in the factory was free of fumes.
The record shows that Jones had previously complained of the "seizure-like" episodes and had stated that she was allergic to cologne and perfume. On March 13, 1978, Jones was treated by a physician named Dr. McKellar because of "dizziness, fainting, and `falling out' spells." On April 13, 1978, Jones was treated at the Louisiana State University Medical Center Walk-In Clinic because she complained that she "fell out" and was dizzy. On November 2, 1980, Jones sought treatment at the Louisiana State University Medical Center emergency room where she again complained of fainting spells. The record also shows that, before her employment with Ruskin, Jones completed a form entitled, "Job Placement Medical Questionnaire" and answered "yes" to the question, *1128 "Did you ever have reactions to chemicals?"
While employed at Ruskin in September of 1990, Jones was treated by Dr. Richard Burton, a neurologist, for "black-out spells" which had allegedly been occurring since 1983 or 1985. Dr. Burton performed an EEG and an MRI, both of which revealed that Jones' brain was normal.
On January 10, 1995, Jones was treated by Dr. Carlos Irizarry, a family practitioner, who opined that Jones should not be around perfumes or colognes. He did, however, recommend more testing but Jones failed to obtain further testing.
On February 6, 1995, Jones was treated by Dr. Peter Boggs of the Asthma-Allergy Clinic for alleged allergies to perfumes and colognes. Dr. Boggs' diagnosis was that Jones did not have any allergies and that her problems were psychiatric.
On February 10, 1995, Jones was treated by Dr. Benjamin V. Nguyen, a neurologist. Dr. Nguyen performed an EEG, which revealed no abnormal brain wave activity. He diagnosed her "falling out spells" as pseudo-seizures and recommended that she see a psychiatrist.
On May 1, 1995, Jones was treated by Dr. Michael F. Zambie of the Allergy and Asthma Clinic. Dr. Zambie diagnosed her as having "Allergic Rhinitis," but noted that her "spells" were very unusual. He further noted that a doctor in Colorado would be the only doctor who could properly diagnose Jones' problem.
On May 31, 1995, Jones was treated by a psychiatrist, Dr. James H. Phillips. Dr. Phillips diagnosed Jones as having a conversion disorder and stated that she could return to work without restrictions.
On April 17, 2001, Jones was treated by Dr. William J. Nassetta, a specialist in occupational medicine. Dr. Nassetta made the following assessment in his report:
"In my office during the examination, Ms. Jones had an episode very similar to the one described in her medical records. It occurred at the end of the examination, while she was comfortably sitting on the examination table. There was no perfume in the room. Ms. Jones had just been told that she `was fine' after the examination, and was free to go. Her legs began shaking, then her arms, her eyes were closed, then opened and rolled around and back. She slurred her speech, but could be understood and asked for water. Ms. Jones was given a sip or two and she revived readily after shaking for approximately one minute. She became imbalanced and held onto the wall when escorted out of the room and was offered a wheelchair. The nurse took her to the car by way of a wheelchair, and when she climbed out she was able to readily stand without difficulty. She stated, `now you can see what I live with everyday.' Although she was accompanied by someone who drove her to the interview, it is important to note that the patient denies this ever happening while she drives, and she continues to do so without worry about it, but she has an `allergy' to gasoline.
During the examination, a `dramatic' sway was noted when asked to stand with her arms in front of her for the neurologic exam, and she appeared to `kick out' lower extremities bilaterally after elicitation of the individual patellar reflex with hammer. Both legs kicked out simultaneously with testing. Otherwise, her examination was benign. She was not asked to close her eyes during the Romberg exam, since she began such a significant sway prior to closing them. Her exaggerated appearing reflexes and sway was very atypical, and would not be expected to occur in a *1129 neurologically impaired person who was completely balanced during her ambulation to and from the interview and examination rooms, and able to drive an automobile.
In a visit to Dr. Sullivan, date unknown the client said, she first noticed some sensitivity to perfumes and colognes when she was in her thirties, she noticed the problem getting worse over the last six years. If the problem began in her thirties, as it appears in the medical records reviewed, it would have been occurring for the last twenty years, not `since 1989 or 90' as she stated. From the medical records, it can be noted that her symptoms began years before she started work at the Ruskin Manufacturing Plant."
* * * * *
"The only physician to give Ms. Jones a diagnosis related to potential exposure to chemicals is Dr. Rea. He arrived at his diagnosis without any objective information in regards to specific exposures in Ms. Jones' workplace. Additionally, non-validated, unaccepted testing procedures were utilized.
Given the facts that:
 Ms. Jones' `seizures' pre-dated her work at Ruskin Manufacturing by some years;
 All objective neurological testing by multiple practitioners has been negative;
 There were no known, documented over-exposures to chemicals in the work environment;
 There is no peer-reviewed scientific literature to support this type of disorder with the alleged exposures;
It is my professional opinion that within a reasonable degree of medical certainty Ms. Jones' condition is unrelated to her work at Ruskin Manufacturing."
Dr. William Rea, a board certified physician in environmental medicine, testified by way of a deposition. Dr. Rea concluded that Jones had chemical sensitivities, neurotoxicity, chronic fatigue, and food sensitivity. In his opinion, her condition was related to her long-term exposure to fumes while employed with Ruskin. Dr. Nancy Didriksen, a psychologist, testified that Jones suffered from toxic encephalopathy, a brain injury caused from exposure to toxic substances.
A portion of Jones' testimony was adduced at the hearing. The other portion, however, was adduced by way of a deposition because Jones continued to have her "seizure-like" episodes at the hearing and in the presence of the WCJ. Jones also testified that she did not have the "seizure-like" spells prior to her employment with Ruskin. She further testified that she had worn perfume up to 1990 or 1991.
After thoroughly reviewing all of the above evidence, the WCJ found that Jones did not have an occupational disease. Jones appealed, asserting that the WCJ erred in not finding that she contracted an occupational disease while in the employ of Ruskin.

Discussion
Under the Workers' Compensation Act, La. R.S. 23:1031.1 provides, in pertinent part, the following:
A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.

*1130 B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease.
The findings of the WCJ will be affirmed unless the judgment is manifestly erroneous. Chaisson v. Cajun Bag & Supply Co., 97-1225 (La.3/4/98), 708 So.2d 375. In applying the manifest error standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; Stobart v. State Through Department of Transportation, 617 So.2d 880 (La.1993).
When the judgment is based on a credibility call, great deference must be given to the WCJ's findings. Stobart, supra. A credibility call may be reversed only when documents or objective evidence so contradict the story of the witness, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit it. Rosell v. ESCO, 549 So.2d 840 (La.1989); Cox v. Roofing Supply, Inc., 36,275 (La.App.2d Cir.8/14/02), 825 So.2d 1271. In the absence of such a showing, the WCJ's choice between two permissible views of the evidence will not be disturbed. Cox, supra, citing Billington v. General Motors, Corp., 31,585 (La.App.2d Cir. 2/24/99), 728 So.2d 966; Hymes v. Monroe Mack Sales, 28,768 (La.App.2d Cir.10/30/96), 682 So.2d 871.
The causal link between the employee's occupational disease and work-related duties must be established by a reasonable probability. Shields v. GNB Technologies, Inc., 33,911 (La.App.2d Cir.10/4/00), 768 So.2d 774. Expert testimony is required to support a finding of an occupational disease. Shields, supra.
The WCJ, in oral reasons for judgment, found that Jones' "seizure-like" spells pre-existed her employment at Ruskin, and she weighed the testimony of Dr. Didriksen and Dr. Rea against the findings of Dr. Nassetta. The WCJ was "particularly impressed" with Dr. Nassetta's expert opinion and found him to be more credible than Dr. Didriksen and Dr. Rea. Dr. Rea's opinion was based upon Jones' description of her work environment and not upon objective evidence obtained from the Ruskin facilities. As a result, the WCJ found that Jones failed to meet her burden of proof by a preponderance of the evidence that a causal connection existed between her condition and her employment. Additionally, the WCJ concluded that Jones' condition was a "continuation of a pre-existing condition unrelated to her work environment" and was not an occupational disease.
From our review of the extensive medical evidence, we cannot conclude that the WCJ's choice of Dr. Nassetta's opinion over the opinion of Dr. Rea was clearly wrong and manifestly erroneous. Likewise, the WCJ's reliance upon the evidence indicating that Jones' chemical sensitivity pre-dated her employment and was related to exposure to chemicals outside of the workplace justifies a conclusion that the causal connection of the alleged occupational disease with Jones' employment was not substantiated. Accordingly, we defer to the trier-of-fact's reasonable conclusions in this case and affirm the judgment.

Conclusion
For the foregoing reasons, the judgment of the WCJ in favor of Ruskin Manufacturing and against Dorothy Jones is affirmed. Costs are assessed to Dorothy Jones.
AFFIRMED.