**Reversed and Rendered and Opinion Filed December 29, 2022**



In The
# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-20-00525-CV

**THE UNIVERSITY OF TEXAS SYSTEM, Appellant**
**V.**
**DIANE M. BARTEK, Appellee**

### On Appeal from the 101st Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. DC-16-12515

## MEMORANDUM OPINION

Before Justices Myers, Nowell, and Rosenberg[1]
Opinion by Justice Rosenberg

This is a worker's compensation case. After the Texas Department of

Insurance (Department[2]), Division of Worker's Compensation (Division[3]) ruled that

Diane M. Bartek "did not sustain a compensable injury in the form of an

occupational disease" on February 4, 2015, and she "did not have [a] disability

---

[1] The Hon. Barbara Rosenberg, Justice, Assigned. This case was submitted without oral argument. At the time this case was submitted, Justice Leslie Osborne was a member of the panel. After her resignation, Justice Rosenberg was designated to sit on the panel and participated in the decision of this case. TEX. R. APP. P. 41.1.

[2] Section 401.011(13-a) defines "Department" as "the Texas Department of Insurance." TEX. LAB. CODE ANN. § 401.011(13-a).

[3] Section 401.011(16-a) defines "Division" as "the division of workers' compensation of the [D]epartment." LAB. § 401.011(16-a).

during the period beginning August 10, 2015 through April 17, 2016, as a result of the claimed injury," and the Department's appeals panel affirmed that ruling, Bartek filed a petition for review in the trial court. After a trial, the jury found Bartek sustained a compensable injury in the form of an occupational disease and that injury was the producing cause of her disability and awarded her attorney's fees.

The University of Texas System (UT System) appeals the trial court's final judgment in favor of Bartek and raises two issues on appeal arguing: (1) the evidence is legally and factually insufficient to support the judgment because the expert's opinion on causation was unreliable and amounts to no evidence; and (2) the trial court erred when it overruled the UT System's objection to the jury charge on the basis that it applied a definition of "injury" that is contrary to the law. We conclude the testimony of Bartek's expert was unreliable and is therefore, no evidence. As a result, the evidence is legally insufficient to support the trial court's judgment. The trial court's judgment is reversed and a take-nothing judgment is rendered in favor of the UT System.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In her original petition, Bartek, an employee of the UT System at the University of Texas at Dallas Police Department, alleged she sustained a compensable injury in the form of an occupational disease on February 4, 2015. And she alleged that she sustained a compensable disability as a result of the occupational disease from August 10, 2015 through April 17, 2016.

On April 14, 2016, a Division benefit review officer held a benefit review conference to mediate the resolution of the disputed claim. However, the parties were unable to reach an agreement.

On June 9, 2016, a Division hearing officer held a contested case hearing and signed a written decision and order on June 15, 2016. In the "discussion" section of the written decision and order, the hearing officer noted, among other things:

- After an ice storm in February 2015 that caused water damage to the police building where Bartek worked, including wet carpet and walls, the area was tested and found to have developed mold;

- "The air in the building was tested on March 17, 2015[,] and found to have elevated levels of Stachybotrys mold spores in several offices. . . where [Bartek] worked";

- "[Bartek] and other employees working in the building were relocated on March 18, 2015[,] and the mold [was] cleaned up and remediated by May 21, 2015" and the remediation company reported that "cleaning and remediation had been successfully completed and there was no longer air contamination by mold spores in the building";

- Maureen McGeehan, M.D., an allergist Bartek had been seeing since October 2010, ordered an immunoassay after Bartek's mold exposure, which reported that the antigen for Stachybotrys exposure was absent or undetectable in her system on March 20, 2015.

- On April 28, 2015, another test was performed that found elevated levels of trichothecene mycotoxin, group of toxins from multiple genera of fungi, in Bartek's urine, which "may be associated with exposure to mold, or acquired from foodstuffs in which it is naturally occurring, or from livestock feeds";

- "[Bartek] admitted she is exposed to livestock feed daily";

- Bartek provided a causation opinion from William J. Rea, M.D., a specialist in environmental medicine, who is treating Bartek for

conditions he relates to "toxic effects of mold exposure," including diagnoses of "chemical sensitivity, allergic rhinosinusitis, allergic food gastroenteritis, autoimmune nervous system dysfunction, immune deregulation, vasculitis, headache, chronic fatigue, fibromyalgia, [] metal sensitivity, [and] toxic encephalopathy";

- Bartek provided a causation opinion from William Marcus Spurlock, M.D., "who has been treating [Bartek] with vitamin[s] and medications for her complaints" and that Bartek "was continuously exposed to mold for over 5 years resulting in chronic illness";

- "The opinions [of Dr. Rea and Dr. Spurlock] were not persuasive because they are based on an assumption of continuous exposure to mold at work over a long period of time";

- "[T]he facts show that mold was detected only after flooding in February, 2015[,] with testing on March 17, 2015[,] showing mold spores in the interior air in greater concentrations than the outside air";

- There was no evidence of direct mold exposure other than to spores in the air and [Bartek] has only claimed inhalation exposure";

- "The evidence showed that [Bartek] had not developed antigen in her blood for mold exposure, and the presence of tric[h]othecene in [Bartek's] urine is explained by [Bartek's] exposure to livestock feed daily at home";

- Dr. Rea took Bartek off work on August 7, 2015 and did not give her a release to return to work until April 17, 2016;

- Bartek testified that "the reason for the work restrictions before that date was that she felt remediation was not complete" and the UT System "had agreed to do regular mold testing after that"; and

- "The evidence failed to show that [Bartek] was unable to perform her preinjury work during the disability period claimed, but rather that she was taken off to avoid further exposure to mold at work."

In the "findings of fact" section of the written decision and order, the hearing officer found in part:

3. [Bartek] did not sustain damage or harm to the physical structure of her body in the course and scope of her employment in the form of an occupational disease with a date of injury of February 4, 2015.

4. [Bartek] was not unable to obtain or retain employment at wages equivalent to her preinjury wage due to her claimed injury of February 2, 2015[,] during the period beginning August 10, 2015[,] through April 17, 2016.

In the "conclusions of law" section of the written decision and order, the hearing officer found in part:

3. [Bartek] did not sustain a compensable injury in the form of an occupational disease with a date of injury of February 4, 2015.

4. [Bartek] did not have [a] disability during the period beginning August 10, 2015[,] through April 17, 2016[,] as a result of the claimed injury of February 4, 2015.

Bartek requested review of the hearing officer's decision and order by the administrative appeals panel. On September 6, 2016, the administrative appeals panel gave notice that the hearing officer's decision and order were final.

In the trial court, Bartek filed a petition for judicial review of the Department's decision relating to compensability and benefits eligibility and requested attorney's fees. In her petition, Bartek complained that the hearing officer's findings of fact nos. 3–4 and conclusions of law nos. 3–4 were contrary to the preponderance of the evidence. The UT System answered, generally denying the allegations and asserting the affirmative defenses of immunity from suit and immunity from liability as well

as maintaining that as an agency or representative of the State, it is not liable for attorney's fees in Bartek's action.

Before trial, the UT System moved to exclude the causation testimony of Dr. Rea as unreliable because his opinion was based on erroneous assumptions, i.e., five years of mold exposure, and his methodologies for diagnoses and causation were known to be unsound in the medical and legal communities. The trial court denied the UT System's motion. Immediately before trial, the UT System renewed its objections to Dr. Rea's causation opinions, which the trial court overruled. During the trial, Dr. Rea's deposition testimony was read to the jury. At the close of the UT System's case, the UT System moved for a directed verdict on the grounds that Bartek had not met her burden of proof, which the trial court denied. A majority of the jury, i.e., ten jurors, returned a verdict in Bartek's favor, finding that she sustained a compensable injury in the form of an occupational disease and that compensable injury was a producing cause of her disability.

The UT System filed a motion for new trial and a motion for judgment notwithstanding the verdict. Both motions were denied by operation of law.

## II. LEGAL SUFFICIENCY OF THE EVIDENCE

In issue one, the UT System argues the evidence is legally and factually insufficient to support the judgment for the reason that the expert's opinion on general and specific causation was unreliable and amounts to no evidence because: (1) it assumes facts not in the record; (2) it is based on testing methods that have

been openly rejected by the scientific and medical communities; and (3) many courts have rejected Dr. Rea's testimony as to causation as well as his scientifically unsupported diagnoses and methodologies.[4]  Bartek responds that there is ample evidence to support the jury's verdict because Dr. Rea is Bartek's treating physician and he is knowledgeable of the facts.

When confronted by both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence.  *See Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981).  Accordingly, we begin by reviewing the UT System's argument that the evidence is legally insufficient to support the judgment.

### A.  Standard of Review

Evidence is legally insufficient to support a jury finding when: (1) the record discloses a complete absence of evidence of a vital fact: (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact: (3) the evidence offered to prove a vital fact is no more than a mere

---

[4]  The UT System's survey of the law is correct with some of the courts specifically rejecting or discrediting Dr. Rea's opinions.  *E.g., Bradley v. Brown*, 42 F.3d 434, 436–39 (7th Cir. 1994), *affirming* 852 F. Supp. 690 (N.D. Ind. 1994); *Coffey v. Cty. of Hennepin*, 23 F. Supp. 2d 1081, 1086 (D. Minn. 1998); *McCook v. Unum Life Ins. Co. of Am.*, 463 F. Supp. 3d 729, 737–39 (E.D. La., 2020) (order); *Bryant v. Metric Prop. Mgmt., Inc.*, No. Civ.A. 4:03-CV-212-Y, 2004 WL 1359526, at *7–8 (N.D. Tex. June 17, 2004) (order); *Hundley v. Norfolk & W. Ry. Co.*, No. 91 C 6127, 1995 WL 17826563, at *1 (N.D. Ill. Apr. 3, 1995) (order); *Brown v. Rreef Mgmt. Co.*, No. 05-06-00942-CV, 2007 WL 182975, at *1–2 (Tex. App.—Dallas June 27, 2007, pet. denied) (mem. op.); *McNeel v. Union Pac. R.R. Co.*, 753 N.W.2d 321, 329–332 (Neb. 2008); *Myhre v. N.D. Workers Comp. Bureau*, 653 N.W.2d 705, 710–713 (N.D. 2002); *Jones v. Riskin Mfg.*, 834 So.2d 1126 (La. Ct. App. 2002).  However, while it is informative, these decisions are not determinative of our analysis.

scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). Under a traditional legal sufficiency standard of review, when a party attacks the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof at trial, it must demonstrate there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). In determining whether the evidence is legally sufficient to support a finding, an appellate court considers the evidence in the light most favorable to the judgment and indulges every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822.

When a scientific opinion is not conclusory but the basis offered for it is unreliable, a party who objects may complain that the evidence is legally insufficient to support the judgment. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816–17 (Tex. 2009). However, in such a case, if a reviewing court were to consider the evidence in the light most favorable to the verdict, that court should not look beyond the expert's testimony to determine if it is reliable. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 712 (Tex. 1997). But such an argument is too simplistic because it reduces the no-evidence standard of review to a meaningless exercise of looking to see only what words appear in the transcript of the testimony, not whether there is some evidence. *Id.* Reliability is determined by looking at numerous factors, therefore, when reviewing whether expert testimony is scientifically unreliable such

–8–

that it is no evidence, an appellate court necessarily looks beyond what the expert said. *Id.*

### *B. Applicable Law*

### 1. Judicial Review of Administrative-Level Workers' Compensation Decisions

The Texas Workers' Compensation Act[5] entitles a subscribing-employer's employee who sustains a compensable injury to all health care reasonably required by the nature of the injury as and when needed. TEX. LAB. CODE ANN. § 408.021(a). The Texas Workers' Compensation Act provides for employee compensation for "compensable injuries" which means "an injury that arises out of and in the course and scope of employment for which compensation is payable under [the Act]." LAB. § 401.011(10). It also provides for employee compensation for a "disability" which the Act defines as "the inability because of a compensable injury to obtain and retain employment at wages equivalent to the preinjury wage." LAB. § 401.011(16). An "occupational disease" is defined as "a disease arising out of and in the course of employment that causes damage or harm to the physical structure of the body. . . . The term does not include an ordinary disease of life to which the general public is exposed outside of employment, unless that disease is an incident to a compensable injury or occupational disease." LAB. § 401.011(34).

---

[5] Section 401.001 of the Texas Labor Code provides that title 5, subtitle A, may be cited as the "Texas Workers' Compensation Act." LAB. § 401.001.

At the administrative level, disputed claims for benefits proceed through a three-step process: (1) a benefit-review conference; (2) a contested-case hearing; and (3) an administrative appeal. LAB. §§ 410.021–034, 410.151–169, 410.201–.209; *Morales v. Liberty Mut. Ins. Co.*, 241 S.W.3d 514, 516 (Tex. 2007). A claimant may appeal the administrative appeals panel's decision by filing suit in the district court. LAB. § 410.301; *Morales*, 241 S.W.3d at 516. The decision of the appeals panel is final in the absence of an appeal for judicial review. LAB. § 410.205.

The Texas Workers' Compensation Act divides judicial review of workers' compensation appeals into two categories by drawing a distinction between issues that concern compensability and those that do not. LAB. §§ 410.255(a) (all issues other than compensability), 410.301(a) (compensability and benefits eligibility); *Morales*, 241 S.W.3d at 516. Section 410.301 governs judicial review of administrative-level workers' compensation decisions regarding compensability or benefits eligibility. LAB. § 410.301; *Morales*, 241 S.W.3d at 516. The issues of compensability or benefits eligibility that were decided by the administrative appeals panel are tried to the court or to a jury, and the appealing party bears the burden of proof by a preponderance of the evidence.[6] LAB. §§ 410.302(b) (issues limited), 410.302 (burden of proof); *Williams v. City of Richardson*, No. 05-20-00085-CV, 2021 WL 3891593, at *2 (Tex. App.—Dallas Aug. 31, 2021, no pet.) (mem. op.).

---

[6] We note that all issues other than compensability or benefits eligibility are reviewed under the substantial evidence rule. LAB. § 410.255(b); *Williams*, 2021 WL 3891593, at *2.

–10–

The records of a contested case hearing are admissible in accordance with the Texas Rules of Evidence, and trial is limited to issues decided by the appeals panel and on which judicial review is sought." LAB. § 410.302; *Williams*, 2021 WL 3891593, at *2. Further, to the extent there is a conflict between the Texas Workers' Compensation Act and the Texas Rules of Civil Procedure, the former controls. LAB. § 410.305. However, the fact finder does not simply review the administrative appeals panel decision for reasonableness, but decides the issues independently based on a preponderance of the evidence. *Williams*, 2021 WL 3891593, at *2.

### 2. Reliability of Expert Opinion

Expert testimony is required when an issue involves matters beyond jurors' common understanding. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). However, the testimony of an expert is generally opinion testimony and whether it rises to the level of evidence is determined under the Texas Rules of Evidence, including Rule 702. *Havner*, 953 S.W.2d at 712.

Texas Rule of Evidence 702 provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. TEX. R. EVID. 702. In accordance with Rule 702, expert testimony is admissible if: (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d

–11–

549, 556 (Tex. 1995). Th relevance and reliability requirements of Rule 702 apply to all expert opinions even though the criteria for assessing them must vary depending on the nature of the evidence. *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 216–17 (Tex. 2010). A claim will not stand or fall on the mere *ipse dixit* of a credentialed witness. *Gharda*, 464 S.W.3d at 349.

There are six useful considerations for determining the reliability of expert testimony, which are sometimes referred to as the *Robinson* factors:

(1)     the extent to which the theory has been or can be tested;

(2)     the extent to which the technique relies on the subjective interpretation of the expert;

(3)     whether the theory has been subjected to peer review, publication, or both;

(4)     the technique's potential rate of error;

(5)     whether the underlying theory or technique has been accepted as valid by the relevant scientific community; and

(6)     the non-judicial uses which have been made of the theory or technique.

*Transcontinental Ins.*, 330 S.W.3d at 216 (citing *Robinson*, 923 S.W.2d at 557). The *Robinson* factors apply to a no-evidence review of scientific evidence. *Havner*, 953 S.W.2d at 714.

Whether an expert's testimony is reliable is based on more than whether the expert's methodology satisfies the *Robinson* factors, which are non-exclusive. *See Gharda*, 464 S.W.3d at 349; *Transcontinental Ins.*, 330 S.W.3d at 216. Further, Rule 702 contemplates a flexible inquiry. *Transcontinental Ins.*, 330 S.W.3d at 216.

An expert's testimony must not suffer from an analytical gap that renders it unreliable. *See Gharda*, 464 S.W.3d at 349. Analytical gaps may include circumstances where: (1) the expert improperly applies otherwise sound principles and methodologies, i.e., examining the facts relied on; (2) the expert's opinion assumed facts that vary materially from the facts in the record, i.e., examining the facts in the record; and (3) the expert's opinion is based on tests or data that do not support the conclusions reached, i.e., examining the expert's ultimate opinion. *See Gharda*, 464 S.W.3d at 348–49. If an expert relies upon unreliable foundational data, any opinion drawn from that data is likewise unreliable. *Havner*, 953 S.W.2d at 714.

Unreliable expert testimony, including an unsupported expert opinion, is legally no evidence. *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 410 n.23 (Tex. 2016); s*ee Pollock*, 284 S.W.3d at 820.

### 3. General and Specific Causation

General and specific causation requirements may apply in the context of a workers' compensation claim. *See Texas Workers' Compensation Ins. Fund v. Lopez*, 21 S.W.3d 358, 363–66 (Tex. App.—San Antonio 2000, pet. denied). "Toxic tort" causation must be applied in the workers' compensation context. *See id.* (general or specific causation evidentiary requirements used to evaluate expert testimony in toxic exposure workers' compensation case).

General causation involves whether the substance at issue is capable of causing the injury at issue while specific causation involves whether the substance at issue in fact caused the particular injury at issue. *Havner*, 953 S.W.2d at 714. However, general causation is never the ultimate issue of causation tried to the finder of fact in exposure cases. *Bostic v. Georgia-Pacific Corp.*, 439 S.W.3d 332, 351 (Tex. 2014).

Specific causation involves whether a substance caused a particular individual's injury. *Havner*, 953 S.W.2d at 714. Importantly, when the evidence demonstrates that there are other plausible causes of the injury or conditions that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *See Bustamonte v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017); *Havner*, 953 S.W.2d at 720.

Expert testimony is particularly necessary in exposure cases, in which medically complex diseases and causal ambiguities compound the need for expert testimony. *See Brown v. Rreef Mgmt. Co.*, No. 05-06-00942-CV, 2007 WL 1829725, at *1 (Tex. App.—Dallas June 27, 2007, pet. denied). Proving one type of causation does not necessarily prove the other, and logic dictates that both are needed for an exposure plaintiff to prevail. *See id.*

### C. *Application of the Law to the Facts*

First, the UT System argues Dr. Rea's expert causation opinion was unreliable and amounts to no evidence because it assumes facts not in the record. More

−14−

particularly, it contends that Dr. Rea's opinion assumed facts that vary materially from the facts in the record; he relied upon facts not in the record. That is, Dr. Rea's opinion is based on pure speculation as to the duration of Bartek's exposure to Stachybotrys mold. Without citation to the record, Bartek maintains "there is ample evidence to support that [her] exposure was for the entire time [Bartek] was employed with [the UT System]."

In *Plunkett v. Connecticut Gen. Life Ins. Co*., 285 S.W.3d 106 (Tex. App.— Dallas 2009, pet. denied), this Court considered a toxic tort case involving claims for property damage by plaintiff apartment tenants, alleging that all of the personal property of each tenant was contaminated by mold on the landlord's premises. *Id.* at 115. The Court looked at the testimony of a toxicologist who opined that all of the plaintiffs' property was contaminated even though he only tested a small number of items, several years after the exposure, which were not taken from areas where mold was found. *Id.* The expert "theorized, based on generalized toxicological expertise about the 'very nature' of mold, that all residents' property items must have been contaminated." *Id.* at 116. Because there was no scientific foundation for the opinion (i.e., "no actual test data from any source"), this Court concluded that the expert's opinion constituted no evidence of causation. *Id*. at 117. There was "no empirical evidence that explain[ed] the validity of his extrapolation . . . ." *Id.*

Here, Dr. Rea testified that Bartek gave him a patient history indicating she had been exposed to black mold for five years. He stated that Bartek told him that

–15–

she began working in a moldy building in 2010. On the health questionnaire that Bartek completed for Dr. Rea, she wrote, in part, "Mold exposure @ work over 5 yrs. Significant health changes during that period." Consistent with Bartek's statement, Dr. Rea's causation letter states that "[Bartek] states that she first moved into a mold[y] [] work building in 2010." However, at trial, Bartek testified she did not notice the mold in her office before February 4, 2015, she did not see mold in her office in March 2010, and she was not aware of any testing before March 2015 that confirmed the presence of mold.

In addition, David Zacharias, the chief of police for the University of Texas at Dallas, testified that he worked in the same building as Bartek since 2009, he had not ever seen mold in the police building before Bartek found mold in her office, he did not receive any reports from employees about mold before Bartek found the mold, he is not aware of the building having been tested for mold prior to March 2015, and he is not aware of anything that would show there was mold in the building for approximately five years duration. Timothy Dorsey, Bartek's coworker who was responsible for support services, testified that no one reported the presence of mold to him before February 2015, he was surprised to find mold in Bartek's office, and he was not aware of any mold or moisture problems in that area of the building until February 4, 2015. Further, Gary Gross, M.D., the UT System's expert testified that he had not seen any evidence supporting that Bartek had been exposed to mold at work for over five years.

If an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded. *City of Keller*, 168 S.W.3d at 813. Dr. Rea's expert opinion on causation was based on Bartek's report of continuous exposure to mold at work over a period of approximately five years; it assumed facts that vary materially from the facts in the record. Moreover, there was no scientific basis to validate that opinion. *See Plunkett*, 285 S.W.3d at 117. As a result, his opinion is drawn from unreliable foundational data. *See Havner*, 953 S.W.3d at 714 (if expert relies on unreliable foundational data, any opinion drawn from that data is unreliable).

Second, the UT System argues Dr. Rea's expert causation opinion was unreliable because it is based on testing methods that have been openly rejected by the scientific and medical communities. Essentially, they contend that Dr. Rea's underlying theory or technique has not been accepted as valid by the relevant scientific community and his opinion is based on tests or data that do not support the conclusions reached. When conducting a no-evidence review, we cannot consider only an expert's bare opinion, but must also consider contrary evidence showing it has no scientific basis. *See Gharda*, 464 S.W.3d at 349; *City of Keller*, 168 S.W.3d at 813.

In his causation report, Dr. Rea diagnosed Bartek with toxic encephalopathy, toxic effect molds and mycotoxins, chemical sensitivity, allergic rhinosinusitis, allergic food gastroenteritis, autonomic nervous system disfunction, immune

–17–

deregulation, vasculitis, headache, chronic fatigue, fibromyalgia, and metal sensitivity. However, Dr. Gross testified that these medical conditions were not caused by or have never been related to exposure to Stachybotrys mold.

Dr. Rea based these diagnoses on the following medical or laboratory findings: urine mycotoxin; delayed immunity test (DIT); immunoglobin levels; venous blood gas; heart rate variability; posture sway (balance) testing (Romberg test); and intradermal serial dilution provocation or neutralization testing. He concluded that "in all medical probability [Bartek's] incapacitation [was] a result of her exposure to molds and mycotoxins in the workplace."

Dr. Rea's causation report states the urine mycotoxin analysis revealed elevated levels of Trichothecene which is a mycotoxin associated with Stachybotrys. However, Dr. Gross testified that this is not a Federal Drug Administration (FDA) approved test, the Centers for Disease Control and Prevention (CDC) had a report that stated it has not been shown to have any relationship to a disease, and he is not aware of any literature that supports the test. Further Dr. Gross stated the test does not reflect the source of the Trichothecene, which could have also been food, medication, or livestock feed. Dr. Gross testified it is not a test that he "would put any stock in to try to help [him] make a diagnosis." Further, Bartek admitted she keeps horses and hay or horse feed on her property. And, the evidence does not demonstrate that these other plausible causes of Bartek's injury or condition were negated, and Bartek was required to offer evidence excluding those causes with

reasonable certainty. *See Bustamonte*, 529 S.W.3d at 456; *Havner*, 953 S.W.2d at 720.

In his causation report, Dr. Rea stated he conducted a delayed immunity test. However, Dr. Gross testified that this test cannot be used to determine whether someone has an allergy to Stachybotrys mold and one of the things that suppresses delayed immunity is steroids, which Bartek was taking.

Next, Dr. Rea's causation report states that he tested Barteks' immunoglobin levels. While Dr. Gross did not have an issue with type of testing, he testified that the testing results actually showed Bartek's IGA, IgG, and IgM were normal, which indicated that Bartek has a normal functioning immune system. As a result, Dr. Gross was unsure how Dr. Rea could opine that Bartek had immune deregulation.

Also, Dr. Rea conducted a venous blood gas test. However, Dr. Gross testified that this test does not have much utility and is not a test that is commonly done. Although the test is reliable, Dr. Gross stated it is not a functional test and it would not be used to determine whether someone was allergic to Stachybotrys mold.

In his causation report, Dr. Rea concluded that the Heart Rate Variability Test revealed "a dominant sympathetic nervous system." However, Dr. Gross testified that this is not a valid test for determining whether someone is allergic to Stachybotrys mold and a person's heart rate varies during the day without exposures.

Dr. Rea concluded in his causation report that "[t]he posturography test documents central and peripheral nervous system dysfunction." Dr. Gross stated

that the Romberg test is a neurological test that reflects whether there is an abnormality in another part of the body, e.g., the spinal system or middle part of the ear. According to Dr. Gross this is not a test that would be used to determine whether someone was having an adverse health effect related to Stachybotrys mold exposure.

Finally, Dr. Rea's expert report relied on intradermal serial dilution provocation or neutralization testing and concluded "the molds and mycotoxins reproduced [Bartek's] symptom [that] she was experiencing at work." However, Dr. Gross testified that studies from a university in California and doctors in Colorado showed that with a high enough concentration, everyone will test positive so the test is not valid. Also, patients who received a placebo had the same incidence of symptoms as the patients injected with the allergen. In addition, Dr. Gross stated that this test is no longer used and would not be a test used for determining whether someone had an allergy to Stachybotrys mold.

Dr. Rea's expert causation opinion was unreliable because it is based on testing methods that have been openly rejected by the scientific and medical communities. His opinion is based on tests or data that do not support the conclusions reached.

Bartek maintains that Dr. Rea is her treating physician and therefore, "empowered under the Texas Workers' Compensation Act to provide a causation report." And as her treating physician, Dr. Rea has knowledge of the facts involved in her work-related injury claim, including specialized reports from her other

–20–

providers and the various testing agencies. We note that, although Dr. Rea was Bartek's treating physician, his opinion must meet the same criteria for establishing causation as any other expert. *See Feria v. Dynagraphics Co.*, No. 08-00-00078-CV, 2004 WL 500869, at \*4–6 (Tex. App.—El Paso Mar. 15, 2004, pet denied) (mem. op.). It did not.

Therefore, Dr. Rea's expert opinion suffers from analytical gaps that renders it unreliable. Accordingly, we conclude that Dr. Rea's expert testimony is legally no evidence.

Bartek submitted the causation letters of Dr. Wm. Marcus Suprlock and Dr. Maureen McGeehan. They were admitted over objection. First, letters written for the purpose of advising as to a doctor's findings on examination and evaluation of a patient are hearsay. *Rollins v. Texas Coll.*, 515 S.W.3d 364, 368 (Tex. App.—Tyler 2016, pet denied). The trial court erred in admitting them. Moreover, the letters suffered from some of the same deficiencies as Dr. Rea's testimony. Neither evaluates the medical probability. The Spurlock affidavit was based on the same assumptions as Rea's testimony. McGeehan does not claim to be an expert. Because Bartek's workers' compensation "causation letters" from Drs. Spurlock and McGeehan are inadmissible hearsay without an exception, and because they are not medical opinions given to reasonable medical probability, they are no evidence of causation.

Consequently, we conclude the evidence was legally insufficient to support the trial court's judgment. The first part of issue one is decided in favor of the UT System.

Based on our resolution of issue one, we need not address the second part of the UT System's first issue arguing the evidence is factually insufficient to support the judgment or its second issue arguing the trial court erred when it overruled the UT System's objection to the jury charge on the basis that it applied a definition of "injury" was is contrary to the law.

## III.  CONCLUSION

We reverse the trial court's judgment and render a take-nothing judgment in favor of the UT System.


/Barbara E. Rosenberg/
200525f.p05                BARBARA ROSENBERG
                           JUSTICE, ASSIGNED

–22–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE UNIVERSITY OF TEXAS
SYSTEM, Appellant

No. 05-20-00525-CV     V.

DIANE M. BARTEK, Appellee

On Appeal from the 101st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-16-12515.
Opinion delivered by Justice
Rosenberg. Justices Myers and
Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that:

Appellee DIANE M. BARTEK take nothing on her claims against appellant THE UNIVERSITY OF TEXAS SYSTEM.

It is **ORDERED** that appellant THE UNIVERSITY OF TEXAS SYSTEM recover its costs of this appeal from appellee DIANE M. BARTEK.

Judgment entered this 29th day of December 2022.