Affirmed in Part, Reversed and Rendered in Part, and Majority and
Dissenting Opinions filed July 24, 2003









Affirmed in
Part, Reversed and Rendered in Part, and Majority and Dissenting Opinions filed
July 24, 2003.

 

 

                                                                                                                                                            

 

 

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-00-00763-CV

____________

 

EXXON CORPORATION, Appellant and Cross-Appellee 

 

V.

 

JAMES MAKOFSKI, SR., AS NEXT FRIEND OF JAMES MAKOFSKI,
JR.; BARTON RUSSELL, AS NEXT FRIEND OF JOHN RUSSELL; ANDREA RUSSELL; SAN JUANITA DEVORA; FELIPE DEVORA;
AND CODI STENNETT, Appellees and Cross-Appellants

 



 

On Appeal from the
269th District Court

Harris
County, Texas

Trial Court Cause
No. 93-04644-A

 



 

M A J O R
I T Y   O P I N I O N

Among
the hundreds of wells drilled in the Tomball Field northwest of Houston in the
1930s, one was found to be leaking oil and gas into an underground aquifer in
1939.  Humble Oil & Refining Company
attempted to recover the lost hydrocarbons by Abackflowing@ the well for almost two years.








Forty
years later and a half mile to the southeast, a water well was drilled for the
Three Lakes subdivision.  When the well
was first tested for organic chemical contaminants in 1990 (after about 10
years of use), it was discovered to contain benzene. The subdivision=s water supply was shifted to an
uncontaminated source shortly thereafter.

In 1993,
several hundred residents of Three Lakes sued Exxon Corporation, alleging the
oilfield leak more than 50 years before involving its predecessor contaminated
the water well and caused them various health problems.  Six residents were selected for a bellwether
trial, which took place over the better part of six weeks.  

At the
conclusion, the jury found Exxon negligent and grossly negligent, and awarded a
total of almost $7 million in actual and punitive damages.  In post-judgment proceedings, the trial court
reduced or eliminated most of the jury awards, rendering take-nothing judgments
against the four adults and reduced judgments for the two minors.

All
parties appeal.  Exxon contends there is
no evidence its negligence caused either the contamination of the water well or
the plaintiffs= specific diseases.  The plaintiffs contend the trial court erred
in disregarding the jury=s awards.  Both are
governed by the same standardCwhether any evidence supports the jury=s verdict.[1]  Because legal standards for reviewing medical
causation are much clearer than those for underground hydrology, we address it
first.  Finding it dispositive, we go no
further. 

                                                             I.
What We Review








Exxon
challenges the opinions of the plaintiffs= four medical experts, arguing they
presented no scientific basis for concluding exposure to the water at Three
Lakes caused the plaintiffs= diseases.  We consider
all the evidence in the light most favorable to the verdict, and indulge every
reasonable inference in that direction.[2]  But we do not take expert testimony at face
value; if it is unreliable, it constitutes no evidence, and we must reverse.[3]

We
disagree with the plaintiffs that two different approaches might applyCone based on the six factors applied
in Merrell Dow Pharmaceuticals, Inc. v. Havner,[4]
and one that looks only for Aanalytical gaps@ in the testimony.[5]  Undoubtedly, the tools used to test the
reliability of expert testimony will vary depending on the field of expertise
involved.  But it is impossible to ignore
the Havner factors here, as the field of expertise is the sameCthe epidemiological evidence
connecting a chemical exposure and a disease.[6]


We also disagree with our dissenting
colleague that Exxon waived error by failing to obtain a record from a pretrial
hearing at which its motions to exclude allegedly unreliable expert testimony
were first considered.  Following this
argument to its logical conclusion, every time a pretrial motion to strike
expert testimony is denied without a reporter=s 
record, we must presume any jury verdict thereafter is valid (no
matter how scientifically unsound).  This
argument is neither raised nor briefed by the parties, apparently for the same
reason they never requested that the hearing be recordedCbecause no testimony was taken at the
pretrial hearing.  Not a single line in any party=s
brief suggests we should look to the pretrial hearing for evidence of
reliability, or that it included anything other than what was repeated a few
days later at trial. 








While
this appears to be an issue of first impression, the Supreme Court has given us
some guidance.  First, it was the plaintiffs= burden to present scientifically
reliable evidence of causation at trial.[7]  Second, Exxon was required to object at
trial (which it did
repeatedly)[8]
so the plaintiffs would have an opportunity to cure any defects regarding
reliability and present us with a fully developed record.[9]  Neither of these guidelines suggests a rule
that, after its objections were overruled, it remained Exxon=s duty to incorporate into the trial
record any and all pretrial evidence that supported the reliability of the plaintiffs= experts.[10]








It is
generally true that unless an appellant files a complete reporter=s record (or a limited appeal[11]),
we presume the omitted portions are relevant and support the jury=s verdict.[12]  But a complete record does not include
matters from other proceedings; we normally test the legal sufficiency of a
jury verdict by the evidence at the jury trial, not by what happened before or
after it.[13] 
Moreover, there is an important difference between presuming and
pretending.  Here, the trial record makes
clear that no evidence was presented at the pretrial hearing.[14]  And if (as discussed below) the evidence at
trial showed that scientific evidence could not support a particular verdict,
any presumption that science held the opposite view a few days earlier has been
effectively rebutted.[15]









Finally,
our colleague=s reliance on a treatise discussing
the admissibility of expert testimony[16]
shows he misconstrues Exxon=s point.  Challenges to
both the admissibility and the legal sufficiency of expert testimony involve
the same substantive guidelines for determining relevance and reliability.[17]  But admissibility of expert testimony is an initial
decision made by the trial judge, usually outside the jury=s presence, and is subject to an
abuse-of-discretion review.[18]  By contrast, legal sufficiency of expert
testimony tests the jury=s decision after the trial, looking at the whole trial record
to see if any evidence supports the verdict.[19]  Had Exxon complained of the pretrial ruling
on admissibility, we would need a record of that hearing to review it.  But Exxon does not.  It is not our place to change this legal
sufficiency point into something else, or dismiss it by reviewing a different
decision by a different decision-maker in a different proceeding according to a
different standard of review.

                                                          II.
Benzene and ALL

James
Makofski, Jr., was an infant when his family moved to Three Lakes in 1985.  In September 1991, he was diagnosed with
acute lymphocytic leukemia (ALL).[20]  Treatment of ALL is expensive and painful; in
James=s case, it included three years of
repeated rounds of chemotherapy and spinal injections.  But the trial testimony also indicated current
treatment is usually successful; in James=s case, annual checkups since 1994
have shown no indications of recurrence. 


The
plaintiffs alleged James=s ALL was a result of his exposure to benzene in the Three
Lakes water supply.  It was undisputed
that current scientific knowledge cannot prove what causes ALL in any
particular instance, and that in 95 percent of ALL cases the cause is never
known.  Because of so many uncertainties,
efforts to establish liability for ALL based on exposure to hazardous
substances have proved daunting.[21]  Here, the plaintiffs= attorneys used epidemiological
studies, a government study, and expert testimony to try to raise a fact
question on causation.








The jury
found Exxon=s negligence caused James=s injuries, and awarded him $1.5
million for past medical care, $1 million for future medical care, $400,000 for
pain and anguish, and $325,000 for impairment. 
After reducing the award for future medical expenses to $156,603 (the
only estimate of costs presented at trial), the trial court entered judgment in
accordance with these awards.  Exxon
challenges all awards for lack of causation; the plaintiffs challenge the trial
court=s reduction of the future medical
award.

The
Epidemiological Studies

In Havner,
the Texas Supreme Court held that scientifically reliable epidemiological
studies showing more than a doubling of the risk may establish a causation
link.[22]  To benefit from this exception to the normal
rules requiring individual proof of causation, a claimant must show a similar
exposure to the subjects studied and exclude other plausible causes with
reasonable certainty.[23]

Benzene
has been known to be potentially harmful to humans for more than a
century.  Thus, a large number of
epidemiological studies have been conducted on its effects.  The parties= experts agreed that benzene has been
shown to cause acute myelogenous leukemia (AML), the most common form of
leukemia found in adults.  But the same
studies have not reached the same conclusion regarding ALL, the most common
form found in children. 

Unfortunately,
almost none of the relevant epidemiological studies appear in the trial court
record, though several were marked for identification and discussed at length
during the trial.  As learned treatises, excerpts from
these studies could be read to jurors, but none were admitted as exhibits for
jurors= independent review.[24]  But while the rules of evidence withhold learned treatises from jurors, that does not mean they
should be withheld entirely from the record. 
Without them, we are hard-pressed to conduct the kind of review Havner
requires. 








Each
party here says the other had the responsibility to place relevant studies in
the record.  A similar disagreement
appears to exist among Texas appellate courts: the Sixth Court of Appeals has
held studies cannot be considered on appeal unless they are Aadmitted into evidence,@[25] but the Fourth Court of Appeals has
relied on studies attached to an appellate brief.[26]  

In Havner,
the Court discussed studies included in the record as well as studies that were
only referred to in testimony.  The Court
found legally insufficient any studies as to which there was no information in
the record (either from testimony or the study itself) establishing confidence
levels and intervals.[27]  This example suggests testimony from a study
may alone be enough, but it must be quite detailed. 

Because
of the uncertainty as to what sources we can review, we asked each party (over
Exxon=s objection) to submit an appendix
with copies of the studies on which they rely. 
Having reviewed them all, we find that even under the more lenient
approach (allowing these studies to be supplemented on appeal) the evidence is
legally insufficient under the Havner standards:








            1.  The Chinese Studies.[28]  This series of studies included more than
100,000 workers, the majority of whom had been exposed to benzene in factories
in China.  For ALL, the study found a
relative risk of 2.8 with a confidence interval of 0.5 to 54.5 at a 95%
confidence level.  As this interval
includes 1.0, the finding was not statistically significant (that is, it was
inconclusive).[29]  The authors concluded that risks were Amarkedly increased@ for ALL, but that Athe excess risk for this condition
was not statistically significant.@[30]

2.  The US/UK Study.[31]  This meta-analysis of more than 200,000
petroleum workers in the United States and United Kingdom found a relative risk
for ALL of 1.32 with a confidence interval of 0.81 to 2.01 at a 95% confidence
level.  As this interval again includes
1.0, the finding was not statistically significant.  The authors concluded that no increased risk
for ALL or several other specific types of leukemia had been shown among
petroleum workers in the two countries.[32] 

3.  The Port Arthur Study.[33]  This study looked at the causes of death
among 18,000 workers at a refinery in Port Arthur, Texas between 1937 and
1978.  For ALL, the study found a
relative risk of 2.6 with a confidence interval of 1.1 to 5.1 at a 95%
confidence level.[34]  But the authors concluded the ALL finding was
spurious because of historical difficulties in distinguishing it from other
leukemias:








From a diagnostic perspective, it might have been
difficult historically to distinguish between patients with CLL [chronic
lymphocytic leukemia] and those with ALL. 
This difficulty would likely have prevailed during a large portion of
the cohort follow-up period. . . . 
Indeed, if even one ALL case was the result of misdiagnosis, the ALL
[finding] would not have been statistically significant.  In this regard, it is noteworthy that one of
the ALL death certificates listed the cause of death as AAlymphatic [sic] leukemia@. 
As this is not a generally recognized diagnosis, we could not determine
the cell type of this cancer. 
Nevertheless, we coded it as acute lymphocytic leukemia in our analysis
and as such, the statistical significance of the ALL result rests on a
questionable diagnosis. . . . No epidemiologic study has demonstrated an
association between exposure to benzene and acute lymphocytic leukemia.  Similarly, no other petroleum refinery study
has reported an increase of ALL. . . . 
Thus, the finding from the Port Arthur refinery was inconsistent with
other studies of refinery workers with similar exposures.  The likely spurious nature of the ALL finding
in the Port Arthur cohort is further supported by the lack of an
exposure-response relationship based on length-of-employment analysis.[35]     

4.  Other Studies Submitted.  Several other studies were submitted that
contained no statistical information on any association between benzene and
ALL.  For example, one study found a
significant association between ALL and other lymphatic leukemias with
exposure to benzene and other solvents, but because of the confounding
chemicals and diseases the study tells us nothing definitive about benzene and
ALL.[36]
Another article stated it would be Asurprising@ if benzene caused only AML, but
limitations in the literature precluded any more definitive conclusion.[37]








5.  Other Studies Mentioned.  The various experts briefly mentioned several
other studies, but only in passing.  For
example, some testified that an author or a study Asays benzene causes ALL@ or Asupports my opinion.@ 
But none of these studies have been supplied to us (even after our
specific request), and nothing gives us any indication of the scope, design,
relative risk, confidence interval, confidence level, or even whether benzene
or ALL were actually involved.  Following
Havner=s example, we cannot grant even a
scintilla of weight to these passing references.[38]


The Three
Lakes Registry

In
addition to general epidemiological studies, the plaintiffs rely on a study by
the Agency for Toxic Substances and Disease Registry (ATSDR), a division of the
federal Department of Health and Human Services that gathers health information
on persons exposed to hazardous substances. 
In 1989, the agency selected benzene to study because of its danger to
humans, its ubiquity in the environment (from work sites, waste dumps,
gasoline, automobile exhaust, tobacco products, and foods), and the lack of
scientific information on the effect of low-level, long-term exposure.  

In 1990,
ATSDR chose to study the Three Lakes subdivision shortly after the
contamination of the water supply was discovered and discontinued.  Interviews were conducted in person and by
telephone with about 1100 residents, with follow-up interviews in subsequent
years.  The data was collected in a ABenzene Subregistry@ report, and in 1998 two of the
primary investigators published a peer-reviewed study of the findings.[39]  








In both,
statistically significant increases at a 99% confidence level were reported (at
least for some age groups in some years) for anemia, ulcers, gall bladder
trouble, stomach or intestinal problems, stroke, urinary tract disorders, skin
rashes, diabetes, kidney diseases, and respiratory allergies.  By contrast, statistically significant decreases
were found at the same confidence level for asthma, emphysema, arthritis,
rheumatism, and hearing and speech impairments. 
No statistically significant differences were found for liver disease,
mental retardation, or cancer.  There was
no finding whatsoever regarding ALL.  

For
several reasons, the ATSDR findings are insufficient to establish causation
under the Havner standards.  First
and foremost, that is because the report itself says they cannot:

The findings in this report cannot be used to identify
a causal relationship between the health outcomes and benzene exposure.  In addition, there are some methodological
differences in data collection that may have biased the reporting rates,
resulting in false positive findings. 
The findings of this report do, however, reinforce the need to continue
regular followup of this population.     

Given this conclusion,
the plaintiffs cannot use the subregistry data to establish causation.  Havner does not allow us to give any
weight to in-court conclusions about a study that disagree so diametrically
with the published conclusions of the researchers who conducted it.[40]

Second,
the ATSDR=s reference to potential bias
recognizes the difficulty in gathering accurate data when many of the
respondents are parties in this litigation. 
Experts for all parties agreed that those involved in litigation are likely
to report higher levels of medical problems. 
The ATSDR researchers attempted to mitigate this problem by asking
residents not whether they had a particular health condition, but whether a
physician had told them they had it. 
What is missing from the plaintiffs= efforts to use the ATSDR data is any
scientific evidence of whether that mitigation was too little or too much.








Third,
the ATSDR also noted another potential source for false positivesCthe large sample size and number of
comparisons in the study.  This comment
apparently refers to the unfortunately-named ATexas Sharpshooter Fallacy,@ in which natives of this state are
alleged to shoot at the side of a barn and then draw a target where the most
holes are located, thereby establishing the accuracy of their marksmanship.[41]  Epidemiologists use the term to identify the
phenomenon that when a large number of health effects are surveyed, there is an
increased likelihood that random chance will produce a statistically
significant association when in fact none exists.[42]

Fourth,
although the authors concluded the Three Lakes data could identify potential
associations,[43]
that does not justify making causation conclusions from it.  The ATSDR=s express purpose for studying Three
Lakes was the lack of epidemiological information on the health effects of
long-term exposure to low levels of benzene. 
As Havner notes, even statistically significant associations in
an isolated study are no evidence of causation, as scientific methodology
requires some confirmation.[44]  








Finally,
the ATSDR data is too general to support the kind of specific uses the
plaintiffs try to make of it.  In their
brief, the plaintiffs make the rather shocking assertion that Exxon did not
dispute general causation, despite days of cross-examination and counter
witnesses called entirely for that purpose. 
Apparently, this is a reference to Exxon=s concession that benzene is
associated with one type of leukemia (AML), but Exxon never conceded the same
as to ALL.  While lumping distinct
diseases together as Aleukemia@ may yield a statistical increase as to the whole category,
it does so only by ignoring proof that some types of the disease have a much
greater association with benzene than others. 
The ATSDR made no attempt to distinguish among many particular types of
diseases with apparently different etiologies. 
The categories of diseases the ATSDR usesCsuch as Aanemia or other blood disorders,@ Askin rashes, eczema, and other skin
allergies,@ or Acancers@Care simply too general to meet Havner=s standards.

The
Experts

Finally,
the plaintiffs also presented two experts to establish a causal connection
between benzene and ALL: Dr. Bernard Goldstein, a physician board-certified in
internal medicine, hematology, and toxicology, and Dr. Stuart Shalat, a doctor
of epidemiology.  Together, their
testimony illustrates most of the practices Havner declares to be
inconsistent with sound methodology among epidemiologists.

At
trial, both experts testified that benzene causes ALL, despite the many
published, peer‑reviewed epidemiological studies finding no statistically
significant relationship.  Neither,
however, appears to have ever offered the same opinion in an established
scientific journal.  In his own textbook,
Dr. Goldstein listed the association between benzene and ALL as Asuggested but unproven@ in 1983, as Asuggested@ in 1986, and in 1993 as a Abiomedical plausibility.@[45] 
Plausibility is not enough.[46]  Havner instructs us to be especially
skeptical of scientific evidence that has not been published or subjected to
peer review.[47]

Dr.
Goldstein explained his divergence from the published literature on his belief
that a lower confidence level should be used in court.  Although he admitted causation Afrom a scientifically proven point of
view@ requires 95 percent certainty, he
imposed only a 51 percent certainty when testifying in court.  Havner expressly rejects that
argument: 








The generally accepted significance level or
confidence level in epidemiological studies is 95% . . .  Virtually all the published, peer‑reviewed
studies on Bendectin have a confidence level of at least 95%. . . . We think it
unwise to depart from the methodology that is at present generally accepted
among epidemiologists.[48]


Dr.
Goldstein justified his departure from current epidemiological standards by
pointing to lower standards used by OSHA, the EPA, or physicians who treat
patients:

[Plaintiffs= counsel]: If you wait till you have this 10-to-1
exactitude that [Exxon is] urging, what=s going
to really happen in this world?

[Dr. Goldstein]: There will be a lot of sick people .
. . I just wouldn=t be practicing good medicine or public health if I waited
till I was absolutely certain. . . . I can=t wait as a physician until I=m 95 percent sure of something before
I can deal with the patient=s potential problems.   


Again,
the Havner Court expressly distinguished between Type I (false positive)
and Type II (false negative) statistical errors when deciding what confidence
level is appropriate.[49]  As noted in the examples given in Havner,
differences in costs and benefits make false positives acceptable in some
situations but unacceptable in others.[50]  For example, it may be appropriate for the
EPA to protect people from chemical exposure on weak evidence that it will
cause any harm, but that does not make it equally appropriate to impose a
judgment of several million dollars on weak evidence that a defendant caused
any harm.  Havner specifically
bars this effort to lower epidemiological confidence levels for courtroom use.[51]








Additionally,
Dr. Goldstein suggested causation conclusions regarding AML should lead to the
same conclusions regarding ALL, as the diseases have Asimilar characteristics.@ 
But he admitted all epidemiological studies in the last twenty years
invariably treat these malignancies separately, and every study filed with us
shows significantly different findings as to each.  We cannot treat an epidemiological study
regarding one disease as if it applied to another.[52]

Finally,
Dr. Shalat reinterpreted the ATSDR=s inconclusive finding regarding
cancer into a statistically significant one by adding to the studyCwhich specifically did not study any
deaths in the Three Lakes subdivisionCstatistics for the general public
regarding deaths from cancer.  Havner expressly
prohibits reanalysis of a study to derive a significant finding if sound
scientific methodology would not draw the same inference.[53]  Even if the incidence of all types of cancer
was relevant (which it is not for the reasons stated above), there is no
evidence that Dr. Shalat=s reconfiguration to reach a conclusion that the authors did
not is scientifically sound.

Conclusion

In sum,
the plaintiffs presented evidence that several experts believe a causal
connection exists between benzene and ALL, while others do not.  But an expert=s belief that a substance might cause
a disease is no evidence that in reasonable probability it did.[54]  No epidemiological study establishes a
statistically significant doubling of the risk of ALL from exposure to benzene;
accordingly there was no evidence thatCmore probably than notCJames=s ALL was caused by exposure to
benzene in the Three Lakes water supply. 
We hold the evidence is legally insufficient to support James Makofski=s damage awards.

                                                III.
Benzene and Other Diseases








The only
other plaintiff who obtained judgment against Exxon was John Russell.  Born in November 1990, he was found to be
anemic in a blood test taken five months after birth.  Subsequent blood tests were occasionally Aborderline,@ but there has been no diagnosis of
anemia since his early infancy.  His
parents testified he has suffered from recurrent nosebleeds, asthma, and skin
rashes.  

The
jurors found John had suffered A$0@ for all damages alleged in the past, but awarded $200,000
for future pain and mental anguish, $100,000 for future impairment, and
$176,000 for future medical care.  Exxon
asserts there is no evidence John=s exposure to benzene caused any of
his ailments, or that this exposure more than a decade ago will in reasonable
probability result in any future damages.   

As with
leukemia, experts for both parties agreed that some types of anemia have been
shown to be associated with benzene exposure and other types have not.  Dr. Michael Gray, an internist board
certified in occupational medicine who testified for the plaintiffs, said he
believed John=s anemia was attributable to benzene,
but admitted the medical records contained no studies excluding iron-deficiency
anemiaCthe most common form, and one not
associated with benzene.  As John has not
been diagnosed with anemia since then, there has been nothing to support this
conclusion thereafter.  Without
establishing the type of John=s anemia, Dr. Gray did not exclude other plausible causes of
it with reasonable certainty.[55]


Nor was
there any other reliable scientific evidence connecting benzene to any of John=s other complaints.  Dr. Gray admitted asthma was not caused by
benzene (and as noted above, the ATSDR reported a statistically significant decrease
in asthma at Three Lakes).  He also
testified benzene had suppressed John=s immune system, but offered no
epidemiological studies or other scientific evidence connecting benzene
exposure at levels John experienced with an appearance of nosebleeds, asthma,
and skin rashes more than a decade later (as would be necessary to support the
jurors= awards of future damages only).  Although nosebleeds, respiratory infections,
and skin rashes have many causes, there is nothing in the trial record to
exclude those alternate explanations but Dr. Gray=s naked assurance.  








Finally,
none of this evidence explains why the jury awarded nothing to John for past
damages but a substantial amount for damages in the future.  Clearly, the award was based on no disease he
has exhibited to date.  Instead,
throughout the trial the plaintiffs= counsel pointed to symptoms John had
rather than diseases, and argued these symptoms were similar to those that
preceded James Makofski=s ALL diagnosis.  His
entire closing argument for John=s damages was an attempt to connect
the two boys= ailments:

You look at John Russell. . . .  What sum of money for John Russell?  He=s eight years old.  He=s at the age that James was.  He=s got the same nosebleeds.  He gets told about the same flus.  He=s also got an asthma problem, not
related in the sense that the asthma is caused by the benzene, but it makes
every cold he has worse for the asthma. 
He=s got the anemia. as Dr. Gray told
you, you know, this is a boy B you might check his anemia one day and it may be okay.  Other days it=s not. . . . You won=t find many eight year olds that sit
that still.  That=s not just well-mannered.  That=s a boy who is a little different
because his body does not have the energy and because he=s got some problems and Dr. Gray=s testified to them.  At this point is it leukemia? No.      

Jurors obviously followed
the unstated conclusion (Abut he might get it in the future@) when they awarded no past damages
but substantial future ones.

But not
a single expert at trial supported this analogy.  All agreed John did not have ALL, and none
could say he probably ever would.  His
testifying expert admitted that no one could state with reasonable medical
certainty that John would develop any form of cancer in the future, much less
ALL.  Moreover, as Exxon points out, the
analogy with Makofski was misleading, as there was no evidence the latter had
anemia or nosebleeds for several years before his ALL diagnosis.  To the contrary, the only testimony at trial
was that Makofski suffered nosebleeds and anemia immediately before his ALL
diagnosis, due to the massive destruction of bone marrow cells that the disease
engenders.








Texas
law prohibits recovery for future diseases unless there is a reasonable medical
probability the disease will occur.[56]  It also prohibits recovery of mental anguish
damages for an increased risk of developing a disease that is not presently
manifest.[57]  We find there was no legally sufficient
evidence to support a causation connection between benzene exposure and any
disease John Russell in reasonable probability will suffer in the future.

IV.
Benzene and Mental Anguish

The
remaining four adult plaintiffs asserted a wide range of medical problems
continuing up to the time of trial, though by that time none of them had lived
in Three Lakes for several years, or been exposed to benzene in the subdivision=s water supply for a decade.  Andrea Russell (John=s mother) presented evidence that she
suffers from anemia and keratoses (benign precancerous skin lesions).  Phillip Devora complained of skin rashes,
acne, and fungal infections on his fingernails. 
His wife Janie sought damages for anemia, benign fibroid growths in her
uterus, and excessive menstrual bleeding (which led to her decision to undergo
a hysterectomy).  Codi Stennett presented
evidence she suffers from skin rashes, leukoplakia (depigmentation of the
skin), fungal infections, bronchial infections, and anemia.  Several of these plaintiffs attributed some
or all of their complaints to Aimmune suppression@ caused by exposure to benzene.

Jurors
apparently attributed almost none of these complaints to the water at Three
Lakes, awarding A$0@ as to every claim for damages except mental anguish (which
they awarded in amounts ranging from $50,000 to $100,000).  The plaintiffs do not challenge the jury=s verdict that they have suffered
nothing but mental anguish.  But they do
challenge the trial court=s order setting aside the mental anguish awards. 








Dr. John
Wilson, an expert in post-traumatic stress syndrome (APTSD@), admitted that while none of the
four adults would meet current medical standards for that diagnosis, they
nevertheless showed some or all of its symptoms.  The plaintiffs argue the verdict could not
have been based merely on their fear of contracting future diseases, as the
trial court excluded such evidence. 
While it is true the trial court made that order (over the plaintiffs= repeated objections), the record
shows the evidence from the plaintiffs= testifying psychologist was nothing
but:

[As to Janie Devora]: She began to have worries about
her family.  She had worries about was
she going to get a blood disorder.  She
began to have sleep disturbance.  She
began to express more stress and anxiety reactions.  She began to have concerns learning that
other people in the community had cancer.

[As to Phillip Devora]: He was a little bit what I
would term guarded in his presentation; but underneath that, he also expressed,
again, specifically, fears and anxieties and apprehensions about what was
happening to him, what was happening to his wife and his family. . . .  But his anxiety was apparent.

[As to Codi Stennett]: I think that the most succinct
way I can put it is that she carries around this anxiety that she knows she=s been exposed to the benzene, that it=s had an effect on her, that it affects her cells and
that she=s going to carry that with her.

[As to Andrea Russell]: She has anxiety.  She has depression.  She=s
traumatized by this experience, and she has current concerns about her physical
health and where that=s going to go starting now and inCfrom there on.

He
agreed with the plaintiffs= counsel that each of the plaintiffs suffered mental anguish
because Athey=ve been poisoned,@ and while he admitted their
experiences fell short of accepted PTSD causes such as combat or concentration
camps, there was a Apossible parallel@ with victims of the latter because
the plaintiffs here had been Agassed and survived.@








Clearly, there was substantial evidence the plaintiffs were
anguished about their exposure to benzene in the Three Lakes water supply.  But all of that evidence related to their
fears about what it might mean for their health.  Adopting the vivid metaphor used by
plaintiffs= counsel, people suffer mental
anguish from drinking poison not because it tastes bad, but because they fear
what it will do to them.  The jury found
these plaintiffs suffered no illness from their exposure to benzene at Three
Lakes in the ten years since it stopped, or in reasonable probability will do
so in the future.  At this point so long
after their exposure, it is clear that their anguish is less related to the
water than to what they have been told about it.

Because Texas law does not permit recovery of mental anguish
damages for fears related to developing a disease that has not occurred and has
not been shown to be likely,[58]
we hold the trial court did not err in disregarding the plaintiffs= mental anguish damage awards.[59]

Conclusion

 Someday, medical
science may find that benzene causes ALL; but on the record before us it is
just as likely to find that it does not. 
Some of the other ailments the plaintiffs have suffered may also be
connected to their exposure to benzene; but on the record before us we simply
cannot tell.  We cannot rush to impose
liability when scientifically reliable evidence is unavailable.[60]

Accordingly, we reverse the judgment of
the trial court, and render judgment that the plaintiffs take nothing.

__________________________

Scott
Brister                                                                                                                     Chief
Justice

 

Judgment rendered and Majority and
Dissenting Opinions filed July 24, 2003.

Panel consists of Chief Justice Brister
and Justices Edelman and Seymore. (Seymore, J.
dissenting).











[1]  See Merrell
Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997) (holding
judgment in accordance with jury verdict improper if no scientifically reliable
evidence supports it); Brown v. Bank of Galveston, N. A., 963 S.W.2d
511, 513 (Tex. 1998) (holding judgment notwithstanding jury verdict proper only
if no evidence supports it).





[2]  See Havner,
953 S.W.2d at 711; see also Daubert v. Merrell Dow Pharms., Inc., 509
U.S. 579, 595, 113 S. Ct. 2786, 2798 (1993).





[3]  See Havner,
953 S.W.2d at 714. 





[4]  Id.





[5]  See Gammill
v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 727 (Tex. 1998).





[6]  See Daubert,
509 U.S. at 591-94, 113 S. Ct. at 2795-97; Havner, 953 S.W.2d at 711-14.





[7]  See Havner,
953 S.W.2d at 720; E.I. du Pont de Nemours and Co. v. Robinson, 923
S.W.2d 549, 557 (Tex. 1995).





[8]  See Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998).  Shortly
before trial, Exxon filed a motion in limine requesting exclusion of several of
the plaintiffs= experts, including 60 pages of briefing, a 28-page
appendix applying the brief to each plaintiff, 127 pages of deposition
excerpts, and 55 pages of medical studies. 
Immediately before Dr. Goldstein and Dr. Shalat took the stand at trial,
Exxon moved to exclude their testimony, and immediately after they finished
moved to strike their testimony, each time requesting and the trial court
allowing the motion in limine to be incorporated by reference in lieu of an
extended oral objection.





[9]  See Maritime Overseas, 971 S.W.2d at
412.





[10]  We also
disagree that this necessarily requires repetition of pretrial evidence before
the jury.  Either party at trial may
incorporate by reference any proof from the pretrial hearing they wish made
part of the trial record.  Here, neither
did. 





[11]  See Tex. R. App. P. 53(d).





[12]  See Feldman
v. Marks, 960 S.W.2d 613, 614 (Tex. 1996). 






[13]  As neither party relies on any evidence from the
pretrial hearing, we need not decide whether a legal sufficiency review should
include evidence of scientific reliability that is never presented to
jurors.  See Campbell v. State, 85
S.W.3d 176, 184 (Tex. 2002) (refusing
to review issue of legal sufficiency without adequate briefing and argument); see
also Harvey Brown, Procedural Issues Under Daubert, 36 Hous. L. Rev. 1133, 1139 (1999)
(suggesting parties Apresumably@ need
not re-offer evidence from pretrial hearing before jury, and that evidence from
pretrial hearing will be considered Aindirectly@ in reviewing sufficiency of the evidence). 





[14]  At trial,
Exxon=s counsel introduced himself to each expert by noting
previous depositions or hearings at which they had crossed swords, but no
mention is made of a pretrial hearing a few days before trial.  Each expert was examined at length about his
deposition testimony, but none about testimony from any pretrial hearing.  On the critical connection between benzene
and leukemia, Dr. Bernard Goldberg admitted he provided neither animal studies
nor epidemiological articles to Exxon=s
counsel at any time between his deposition and trial.  Finally, the very capable attorneys and
experienced trial judge all certainly knew when a record is required and when
it is not.





[15]  The
presumption that omitted portions of a record support a verdict is
rebuttable.  See Polanco v. Pan Amer.
Univ., 818 S.W.2d 97, 99 (Tex. App.CCorpus
Christi 1991, no writ); Candelier v. Ringstaff, 786 S.W.2d 41, 44 (Tex.
App.CBeaumont 1990, writ denied); see also Garza v.
Texas Alcoholic Beverage Comm'n, 83 S.W.3d 161, 166 (Tex. App.CEl Paso 2000),(applying same rule to presumption in
favor of judgments generally), aff=d,
89 S.W.3d 1 (Tex. 2002) cf.
Vickery v. Comm=n for Lawyer Discipline, 5 S.W.3d 241, 252, 256 (Tex. App.CHouston [14th Dist.] 1999, pet. denied) (holding
denial of request for negative finding of fact contrary to court=s judgment did not rebut presumption of validity of
trial court=s verdict). 
Thus, for example, Dr. Michael Gray=s trial
testimony that there were no tests in John Russell=s medical records excluding iron-deficiency anemia (a
form not associated with benzene) rebuts any presumption that the pretrial
hearing included such evidence from the medical records.





[16]  Michol O=Connor, O=CONNOR=S TEXAS RULES: CIVIL TRIALS 289,' 3.5 (2002).]





[17]  See Havner,
953 S.W.2d at 712.





[18]  See Robinson,
923 S.W.2d at 558. 





[19]  See Havner,
953 S.W.2d at 720.





[20]  Sometimes
referred to as acute lymphoblastic leukemia.





[21]  See In re
TMI Litigation, 193 F.3d 613 (3rd Cir. 1999) (affirming summary judgment
striking expert testimony on Daubert grounds that attempted to link ALL
to radiation exposure from Three Mile Island incident); Whiting v. Boston
Edison Co., 891 F. Supp. 12 (D. Mass. 1995) (granting motion to strike
expert testimony on Daubert grounds that attempted to link ALL to
exposure to ionizing radiation); see also Jonathan Harr, A Civil Action (Random House 1995) (studying
trial involving six cases of ALL allegedly caused by underground leakage of trichloroethylene into community water well in Woburn,
Massachusetts).





[22]  953 S.W.2d at
718.





[23]  Id. at
720. 





[24]  See Tex. R. Evid. 803(18).






[25]  See Minn.
Mining and Mfg. Co. v. Atterbury, 978 S.W.2d 183, 198 (Tex. App.CTexarkana 1998, pet. denied).





[26]  See Texas
Workers=Comp. Ins. Fund v. Lopez, 21 S.W.3d 358, 364-65 (Tex. App.CSan Antonio 2000, pet. denied).





[27]  See Havner,
953 S.W.2d at 725-26.





[28]  Song-Nian Yin,
et al., A Cohort Study of Cancer Among Benzene-exposed Workers in China:
Overall Results, 29 Am. J. Indus.
Med. 227 (1996); Song-Nian Yin, et al., An Expanded Cohort Study of
Cancer Among Benzene-exposed Workers in China, 104 Envtl. Health Persp. 1339 (1996); Song-Nian Yin, et al., Leukaemia
in Benzene Workers: a Retrospective Cohort Study, 44 Brit. J. Indus. Med. 124 (1987).





[29]  See Havner,
953 S.W.2d at 723.





[30]  Yin, Overall
Results, 29 Am. J. Indus. Med.
at 232, 233.





[31]  Gerhard K.
Raabe and Otto Wong, Leukemia Mortality by Cell Type in Petroleum Workers
with Potential Exposure to Benzene, 104 Envtl.
Health Persp. 1381 (1996).





[32]  Id. at
1389.





[33]  K.P. Satin, et
al., A 50-year Mortality Follow-up of a Large Cohort of Oil Refinery Workers
in Texas, 38 J. Occup. Envtl. Med.
492 (1996).





[34]  For ease of comparison
to the Havner standards, these figures have been converted from the
standardized mortality ratios used in the article, which are based on a
relative risk of 100.0 rather than 1.0.





[35]  Satin, supra,
at 503.





[36]  Anthony J.
McMichael, et al., Solvent Exposure and Leukemia among Rubber Workers: An
Epidemiologic Study, 17 J. Occup. Med.
234 (1975).





[37]  David A. Savitz
and Kurtis W. Andrews, Review of Epidemiologic Evidence on Benzene and
Lymphatic and Hematopoietic Cancers, 31 Am.
J. Indus. Med. 287 (1997).





[38]  See Havner,
953 S.W.2d at 725-26.





[39]  Jeanne R. Burg
and Ginger L. Gist, The National Exposure Registry: Analyses of Health
Outcomes From the Benzene Subregistry, 14 Toxicology
& Indus. Health 367 (1998).





[40]  953 S.W.2d at
729-30 (holding expert=s conclusion that substance caused birth defects,
based on report in which researchers said it was only potentially capable of
doing so, was not evidence of causation).





[41]  See
Boughton v. Cotter Corp., 65 F.3d 823, 835 n.20 (10th Cir. 1995); Robert F.
Blomquist, Bottomless Pit: Toxic Trials, The American Legal Profession, and
Popular Perceptions of the Law,  81 Cornell L. Rev. 953, 960 n.41 (1996)
(book review).





[42]  Id.





[43]  Burg and Gist,
supra, at 383.





[44]  See Havner,
953 S.W.2d at 727.





[45]  Dr. Goldstein
testified he was upgrading this designation to Aprobable@ in an edition not yet published, but did not indicate
what (if any) peer-review was involved in the publication.  





[46]  See Havner,
953 S.W.2d at 729.





[47]  Id. at
726-27.





[48]  Id.at
723-24.





[49]  Id. at
722-23.





[50]  Id.





[51]  Id. at
722-24.





[52]  Id. at
725 (holding published studies showing statistically significant results
regarding birth defects other than limb reduction defects could not
support a finding regarding limb reduction defects).





[53]  Id. at
720, 727. 





[54]  Id. at
729. 





[55]  Id. at
720.





[56]  See
Pustejovsky v. Rapid‑American Corp., 35 S.W.3d 643, 652 (Tex. 2000).





[57]  See
Temple-Inland Forest Prods. Corp. v. Carter, 993 S.W.2d 88, 93 (Tex. 1999).






[58]  See Carter,
993 S.W.2d at 93. 





[59]  Jurors also
awarded each of the six plaintiffs $500,000 in punitive damages. As we
have found there is no evidence supporting any of the plaintiffs= actual damage awards, we also set aside the awards of
punitive damages. See Twin City Fire Ins. Co. v. Davis, 904 S.W.2d 663,
665 (Tex. 1995).





[60]  See Havner,
953 S.W.2d at 728.